**UNITED STATES of America,
Plaintiff,**

v.

**STANDARD OIL COMPANY OF CALIFORNIA, Defendant.**

**Civ. No. 52334.**

United States District Court,
N. D. California.

July 15, 1971.

Bernard M. Hollander, Donald H. Mullins, William A. Cerillo, U. S. Dept. of Justice, Washington, D. C., Anthony E. Desmond, U. S. Dept. of Justice, San Francisco, Cal., for plaintiff.

William E. Nussman, Thomas J. Klitgaard, Charles A. Storke, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendant.

OPINION AND ORDER

CONTI, District Judge.

This is a civil action brought by the Government charging the defendant, Standard Oil Company of California, with violations of Section 3 of the Sherman Act (15 U.S.C. § 3). The complaint alleges that the defendant has violated said Act by combining to unreasonably restrain and monopolize the distribution and sale of petroleum products in the Territory of American Samoa, and by entering into contracts in unreasonable restraint of that trade. Defendant has moved to dismiss the action for lack of jurisdiction.

Section 3 of the Sherman Act provides in pertinent part:

> "Every contract, combination * * * or conspiracy, in restraint of trade or commerce in any Territory of the

United States or of the District of Columbia, or in restraint of trade or commerce between any such Territory and another, or between any such Territory or Territories and any State or States or the District of Columbia, or with foreign nations, or between the District of Columbia and any State or States or foreign nations, is declared illegal."

It is apparent that American Samoa is not the "District of Columbia", nor a "State", nor a "foreign nation". Therefore, if the Sherman Act is to extend to Samoa, then such possession must fall within the category of "Territories".

At the time of the Sherman Act (1890), the United States had no insular possessions and Congress could not, therefore, have had Samoa in mind. But this is not determinative so long as the word "territory" as used in the Sherman Act can properly be applied to American Samoa. The issue here is basically the same as was presented in Puerto Rico v. Shell Co., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937), wherein the Court stated:

"The only question, therefore, is whether the word "territory", as used in section 3 of the Sherman Act, properly can be applied to a dependency now bearing the relation to the United States which is borne by Puerto Rico (American Samoa)."

The defendant contends that the word "territory", as used in the Sherman Act and many other statutes passed by Congress, applies only to organized territories, that American Samoa is not organized, and that therefore the Sherman Act does not apply to activities in Samoa.

The Government, on the other hand, contends that the word "Territory" in the Sherman Act was used in its most comprehensive sense as including all possessions of the United States, whether organized or not.

Since both parties rely heavily on the *Shell* case, supra, it seems appropriate to begin with an analysis of that decision.

The main issue in that case was whether Puerto Rico could be considered a "Territory" within the meaning of Section 3 of the Sherman Act. Prior to holding that Puerto Rico was such a "Territory" the court discussed its earlier decision of Kopel v. Bingham, 211 U.S. 468, 29 S.Ct. 190, 53 L.Ed. 286 (1909).

In *Bingham*, the Court was called upon to determine if Puerto Rico was a "territory" within the meaning of § 5278 of the Revised Statutes, which provided for the demand and surrender of criminal fugitives by governors of territories and of states. The Court defined "territory", as used in § 5278, to mean "a portion of the country not included within the limits of any state, and not yet admitted as a state into the Union, but organized under the laws of Congress with a separate legislature under a territorial governor and other officers appointed by the President and Senate of the United States." In conclusion, the court in *Bingham* further stated that "it may be justly asserted that Puerto Rico is a completely organized territory, although not a territory incorporated into the United States, and that there is no reason why Puerto Rico should not be held to be such a territory as is comprised in § 5278."

Immediately following this discussion of *Bingham*, the Court in *Shell* concluded:

"*With equal force*, it may be said here that there is no reason why Puerto Rico should not be held to be a 'territory' within the meaning of section 3 of the Sherman Act. We pointed out in the Atlantic Cleaners & Dyers case [Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 52 S.Ct. 607, 76 L.Ed. 1204] * * * that in the light of applicable history and circumstances it was apparent that Congress meant to deal comprehensively with the subject of contracts, combinations, and conspiracies in restraint of trade, 'and to that end to exercise all the power it possessed;' that while Congress in passing section 1 exercised only the power conferred by the com-

merce clause, in passing section 3 it exercised a general power, unlimited by that clause. We therefore concluded that the word 'trade' as used in section 3 should be given a more extended meaning than the same word as used in section 1.

If, as we there determined, Congress *intended by the Sherman Act to exert all the power it possessed in respect of the subject matter,*—trade and commerce,—it is equally reasonable to conclude that *Congress intended to include all territories to which its powers might extend.* The same reason which requires the utmost liberality of construction in respect of the word 'trade' also requires the same degree of liberality of construction in respect of the word 'territory'; and we hold, accordingly, that the word 'territory' was *used in its most comprehensive sense,* as *embracing all organized territories,* whether incorporated into the United States or not, including Puerto Rico." (Emphasis added).

The United States cites the *Shell* case for the proposition that Congress, in passing Section 3 of the Sherman Act, exercised all the power it possessed under Article IV, Section 3, Clause 2 of the Constitution of the United States. It is submitted that in so doing, Congress intended Section 3 to apply to all possessions of the United States, whether organized or not.

Standard Oil, on the other hand, points to the specific language in the holding of *Shell* which states that the word "territory" embraces "all *organized* territories, whether incorporated into the United States or not. * * *" (Emphasis added).

Although the *Shell* case is not entirely clear, this court is of the opinion that the Supreme Court interpreted the word "territories" as used in Section 3 to mean only organized territories.

Although the court did say that Congress intended to include within the reach of Section 3 "all territories to which its powers might extend", said

statement can only be viewed in the context of the previous discussion of *Bingham,* supra, and the subsequent language that the word "territory" embraces "all organized territories. * * *" This court is particularly influenced by the fact that the Supreme Court's holding springs directly from its discussion of *Bingham.* In that case there can be no doubt that "territory", for the purposes of the statute in question, was held to mean an organized territory.

From a perusal of other relevant cases and statutes, it is apparent that Congress has over the years made the distinction between "territories" and other possessions, and that the distinguishing feature is that "territories" are organized pursuant to an Organic Act of Congress. Of particular interest is the case of In Re Lane, 135 U.S. 443, 10 S.Ct. 760, 34 L.Ed. 219 (1890), which was decided just a few months before the passage of the Sherman Act.

In In Re Lane, the defendant was indicted under a carnal knowledge statute and was alleged to have committed the crime "within that part of the Indian Territory commonly known as 'Oklahoma'." The statute was applicable to all areas under the jurisdiction of the United States "except the territories." The issue presented was whether the defendant could come within the exception to the law by claiming that the offense was committed within the territory of Oklahoma. In holding that Oklahoma was not a "territory" within the meaning of the exception, the Supreme Court stated:

"* * * we think that the words 'except the territories' have reference exclusively to that system of organized government long existing within the United States, by which certain regions of the country have been erected into civil governments. These governments have an executive, a legislative, and a judicial system. They have the powers which all these departments of government have exercised, which are conferred upon them by act of congress; and their legisla-

tive acts are subject to the disapproval of the congress of the United States. They are not in any sense independent governments. They have no senators in congress, and no representatives in the lower house of that body except what are called 'delegates' with limited functions. Yet they exercise nearly all the powers of government under what are generally called 'organic acts', passed by congress, conferring such powers on them. It is this class of governments, long known by the name of 'territories', that the act of congress excepts from the operation of this statute. * * *"

The definition of "territory" set out in the *Lane* case was earlier stated in Ex Parte Morgan, 20 F. 298 (W.D.Ark. 1883). In discussing the meaning of "territory" as used in an extradition statute, the court stated:

"A territory, under the constitution and laws of the United States, is an inchoate state,—a portion of the country not included within the limits of any state, and not yet admitted as a state into the Union, but organized under the laws of congress, with a separate legislature, under a territorial governor and other officers appointed by the president and senate of the United States."

The foregoing cases point out examples of statutes in which Congress has made the distinction between "territories" and other possessions of the United States. Further examples of statutes wherein the same distinction has been made are as follows:

*Polygamy Statute*:

"No polygamist, bigamist, or any person cohabiting with more than one woman * * * *in any Territory or other place* over which the United States has exclusive jurisdiction, shall be entitled to vote at any election held in any such Territory, or other place, or be * * * entitled to hold any office, * * * in, under, or for any such Territory or place, or under the United States." (Act of March 22,

1882; 22 Stat. 31; 48 U.S.C. Sec. 1461).

*Panama Canal Act*:

"* * * all laws relating to the rendition of fugitives from justice as between the several States and Territories of the United States, shall extend to and be considered in force in the Canal Zone, and for such purposes and *for such purposes only the Canal Zone shall be considered and treated as an organized Territory* of the United States." (Act of August 24, 1912, Sec. 12; 37 Stat. 569.

*Shipping Act of 1916*:

"The term 'common carrier by water in interstate commerce' means a common carrier engaged in the transportation by water of passengers or property on the high seas * * * from port to port between one State, *Territory*, District, or *possession* of the United States and any other State, Territory, District or possession * * * or between places in the same Territory, District or possession." (Act of September 7, 1916, Sec. 1; 39 Stat. 728; 46 U.S.C. Sec. 801).

It appears to this court that in light of various statutes enacted both before and after the Sherman Act, which have distinguished between "Territories" and other possessions of the United States, and a number of cases which have interpreted "territory" to mean organized territory, that had Congress intended the Sherman Act to apply to unorganized territories, it would have so stated.

The Government contends, however, that it is clear that the Clayton Act (enacted in 1914) is applicable to all possessions of the United States and to hold that the Sherman Act only applies to organized territories would create an "intolerable situation for Federal antitrust enforcement". In pertinent part the Clayton Act provides:

" 'Commerce', as used herein, means trade or commerce among the several States. * * * or between the District of Columbia or any Territory of

the United States and any State * * * or between any insular possessions or other places under the jurisdiction of the United States, or between any such possession or place and any State or Territory of the United States. * * *" (15 U.S.C. Sec. 12).

The fact that the Clayton Act extends to areas which may not be covered by the Sherman Act cannot be of major concern to this court. If Congress feels that this situation creates intolerable problems in the enforcement of antitrust laws, it can amend the Sherman Act to extend to all possessions of the United States. The issue before this court is the intent of Congress at the time of the passage of Section 3 of the Sherman Act, not the effect of that act when coupled with subsequent supplemental legislation.

Further, it appears that Congress, in passing the Clayton Act, intentionally expanded the scope of said Act to include unorganized possessions which were thought not to be covered by the Sherman Act. The following appeared in the House Committee Report submitted by Mr. Clayton:

"Section 1 of the bill (Clayton Act) defines technically for the purposes of this bill certain words, phrases and terms used in the body of the bill. * * * The definition of commerce, it will be observed, is broadened so as to include trade and commerce between any insular possessions or other places under the jurisdiction of the United States, which at present do not come within the scope of the Sherman antitrust law. * * * The act approved July 2, 1890, and commonly referred to as the Sherman law, and supplementary legislation pertaining to the same subject, are restricted in application to commerce among the several states and Territories, the District of Columbia, and with foreign nations. Your committee can conceive of no good reason why the insular possessions or other places now under the jurisdiction of the United States should not be included within the provisions of our antitrust laws, and with this idea in view we have accordingly in this bill broadened the scope of these laws so as to make them applicable to all places under the jurisdiction of the United States." (H. Rept. 627, 63rd Cong., 2d Sess., (1914), pp. 7–8)

In accordance with the authorities cited above, it is the finding of this court that Section 3 of the Sherman Act is not applicable to those possessions of the United States which are unorganized. There remains then only the question of whether American Samoa is an organized territory.

It is clear that American Samoa is an unorganized possession. Congress has never established a civil government for American Samoa by the passage of an Organic Act, but rather has left its administration with the executive branch of the Government in the person of the Secretary of the Interior. Further, as is pointed out in detail in defendant's brief in support of its motion to dismiss, Congress has on many occasions considered the propriety of giving Samoa an Organic Act, and on each occasion has decided that it would be in the best interest of Samoa to leave it unorganized.

In conclusion, this court is in agreement with the reasoning of the National Labor Relations Board in Star-Kist Samoa Inc., 68 L.R.R.M. 1532 (N.L.R.B. 1968). The issue before the court was whether the Labor-Management Relations Act extended to American Samoa. The applicability of such Act is almost identical to that of the Sherman Act and extends to:

"* * * trade, traffic, commerce, transportation, or communication among the several States, or between the District of Columbia or any Territory of the United States and any State or other Territory * * * or within * * * any Territory. * *" 49 Stat. 450, 29 U.S.C. Sec. 152(6).

In holding that American Samoa was not a "Territory" within the meaning of the Act, the court stated:

"The Board has previously interpreted 'Territory', as used in Section 2(6) to include, inter alia, Puerto Rico, the Virgin Islands, and Guam.

In *Ronrico*, supra, the Board concluded that it had jurisdiction in Puerto Rico, finding that the courts had invariably interpreted 'Territory' (in a like statutory context) as meaning only those possessions endowed with certain characteristics. If 'incorporated' and 'organized' it is a 'Territory'. 'Incorporated' means that the territory has been declared by statute or treaty to be a part of the United States. 'Organized' refers to Congressional establishment of a system of local self government. If the possession is organized but not incorporated it may still be a 'Territory'. The determinative factor in such cases is the intent of Congress in enacting the statute. * * * American Samoa is neither 'incorporated' nor 'organized'. It does not have even a rudimentary government established by Congress, but rather one established by the executive branch in the person of the Secretary of the Interior, to whom administrative authority was delegated by the President. It is not specifically included as a territory in Section 14(c) (2). Further distinguishing American Samoa from those dependencies of the United States which have been found to be 'Territories' is the fact that its inhabitants, while American Nationals, are not citizens, that it is not within the jurisdiction of any Circuit Court, and that it has no Federal District Court. Under all of the relevant circumstances, particularly the fact that Congress has not established any form of self government for American Samoa, and in the absence of a clear Congressional mandate, we conclude that American Samoa does not come within the jurisdiction of the Act."

It is, therefore, the order of this court that defendant's motion to dismiss the action for lack of jurisdiction be, and it hereby is, granted.