**AMERICANA OF PUERTO RICO, INC.**

v.

**Samuel R. KAPLUS and J. Kaplus & Sons, Inc., Appellants.**

No. 15444.

United States Court of Appeals Third Circuit.

Argued Jan. 6, 1966.

Filed Oct. 27, 1966.

As Amended Dec. 7, 1966.

Jack L. Cohen, Newark, N. J., for appellants.

Stanley Diamond and Daniel Schiffman, New York City (Maxwell & Diamond, New York City, and Schenck, Price, Smith & King, Morristown, N. J., on the brief), for appellee.

Before BIGGS, GANEY and FREEDMAN, Circuit Judges.

## OPINION OF THE COURT

BIGGS, Circuit Judge.

This diversity action[1] is grounded on a default judgment, obtained in the Superior Court of Puerto Rico for $10,100 by Americana of Puerto Rico, Inc., against Samuel R. Kaplus and J. Kaplus & Sons, Inc.[2] The defendants appeal from a summary judgment rendered on the ground that the courts of the Commonwealth of Puerto Rico are entitled to full faith and credit under 28 U.S.C. Section 1738 and also from an order denying their cross-motion to dismiss for lack of jurisdiction. The cross-motion was based on the theory that 28 U.S.C. Section 1332(d) was inapplicable to Puerto Rican residents in that Congress could not extend the diversity jurisdiction to them. See 240 F.Supp. 854 (D.C.1965).

We will consider the jurisdictional question first. Congress created the lower federal courts and prescribed their jurisdiction by the Judiciary Act of 1789.

---

1. Judgment against the corporate defendant was entered in the name of "Kaplus & Sons, Inc." but this appears to be a mere typographical error. The attached summons and complaint served on the defendants which resulted in the judgment in Puerto Rico describe the corporate defendant as "J. Kaplus & Sons, Inc." It is apparent that "J. Kaplus & Sons, Inc." was in fact the corporate defendant against whom the judgment was obtained.

2. The plaintiff is a corporation of the Commonwealth of Puerto Rico, with its principal place of business at San Juan, Puerto Rico. The defendant, Samuel R. Kaplus, is a citizen of the State of New Jersey and the defendant, J. Kaplus & Sons, Inc., is a corporation of the State of New Jersey, having its principal place of business in the State of New Jersey.

The Act stated that "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of * * * [now $10,000 then $500] and is between—(1) citizens of different States * * * " The construction of this section came before the Supreme Court in 1805 in Hepburn and Dundas v. Ellzey, 6 U.S. (2 Cranch) 445, 2 L.Ed. 332. Mr. Chief Justice Marshall held that a District of Columbia resident could not maintain a suit in the federal district court under the diversity clause. Since Congress copied the constitutional phrase *in haec verba*, Mr. Chief Justice Marshall, seeking to ascertain the intent of Congress, concluded that the District of Columbia was not within the purview of the word "State". He added, however: "It is true, that as citizens of the United States and of that particular district which is subject to the jurisdiction of congress, it is extraordinary, that the courts of the United States, which are open to aliens, and to citizens of every state in the union should be closed upon them. But this is a subject for legislative, not judicial consideration." Id. at 453.

Hepburn remained the law for more than 135 years. In 1940, Congress expanded the diversity jurisdiction of the courts to include controversies between "citizens of different States, or citizens of the District of Columbia, the Territory of Hawaii or Alaska and any State or Territory." 54 Stat. 143. Constitutional power for this enactment was found in 1949. See National Mutual Insurance Company of Dist. of Col. v. Tidewater Transfer Co., 337 U.S. 582, 69 S. Ct. 1173, 93 L.Ed. 1556. The plaintiff in this case was a corporation in the District of Columbia. A majority of five Justices agreed that Congress had the sanction of the Constitution, i. e., that a source of constitutional power supported the enactment. A majority could not agree on the nature of that source. Two Justices of the majority of five reached their conclusion by a broad interpretation of the word "State". Three other Justices in an opinion by Mr. Justice Jackson denied that rationale and based their conclusion on Article I, Section 8, giving Congress power to make rules and regulations for the District of Columbia. In 1956, Congress added residents of the Commonwealth of Puerto Rico to the group eligible to sue under the diversity jurisdiction. 70 Stat. 658. This is the statutory amendment under consideration. Assuming arguendo that the Commonwealth of Puerto Rico is not a "State" within the meaning of Article III, two further problems must be resolved. Is the Commonwealth of Puerto Rico a Territory within the meaning of Article IV, Section 3 of the Constitution which directs Congress to make Rules and Regulations for United States Territories? And if so, does Article IV, Section 3 provide the requisite constitutional directive for the 1956 amendment?

There is no doubt that prior to 1952, Puerto Rico was considered a territory of the United States. See e. g., People ex rel. Kopel v. Bingham, 189 N.Y. 124, 81 N.E. 773 (1907); aff'd 211 U.S. 468, 29 S.Ct. 190, 53 L.Ed. 286 (1909); Detres v. Lions Building Corp., 234 F.2d 596 (7th Cir. 1956). Puerto Rico came to the United States by cession from Spain under the Treaty of Paris of December 10, 1898,[3] 30 Stat. 1754, 1755 (1899), as an aftermath of the Spanish-American War. For a short period of time it was under military government. By the Foraker Act, 31 Stat. 77, April 12, 1900, Congress established a temporary civil government for Puerto Rico to administer local affairs and to provide revenue. The inhabitants of Puerto Rico were declared to be citizens of Puerto Rico and

---

3. The Treaty between the United States and Spain was signed at Paris, December 10, 1898; ratification advised by the Senate, February 6, 1899; ratified by the President February 6, 1899; ratified by Spain March 19, 1899; and ratifications exchanged and the Treaty proclaimed at Washington, April 11, 1899. See 30 Stat. 1754 (1899).

entitled to the protection of the Constitution and laws of the United States.

The Foraker Act was superseded by the Organic Act of 1917, 39 Stat. 951, 48 U.S. C.A. Section 731 et seq., which granted further local legislative powers to the government of Puerto Rico. By this Act of 1917 all inhabitants of Puerto Rico, with certain minor exceptions, were declared to be citizens of the United States. Many rights of local autonomy were enjoyed by the Puerto Ricans under the Organic Act which, as amended from time to time, remained the governing force in Puerto Rico until 1950. On July 3, 1950, the President approved Public Law 600, an Act "To provide for the organization of a constitutional government by the people of Puerto Rico." 64 Stat. 319, 48 U.S.C.A. Sections 731b–731e. This Act offered Puerto Rico "a compact so that the people of Puerto Rico * * * [could] organize a government pursuant to a constitution of their own adoption." [4] The "compact" was approved by the voters of Puerto Rico on June 4, 1951; a constitutional convention was convened, and the constitution drafted by it was ratified by the people of Puerto Rico on March 3, 1952, 48 U.S.C.A. Section 731d note. The President submitted it to Congress which, with minor amendments, approved it by Joint Resolution of Congress, 66 Stat. 327, on July 3, 1952. The Governor of Puerto Rico proclaimed the constitution of the Commonwealth of Puerto Rico to be in force on July 25, 1952.

Prior to the adoption of the Puerto Rican constitution and the establishment of the Commonwealth in 1952, the Island was organized and governed in a manner similar to that of the other territories of the United States. While its legislature was given considerable power over matters of local concern, the framework of government was prescribed by Congress, and the Organic Act of 1917 served as the constitution of Puerto Rico. It was clear that at this time Puerto Rico qualified as a "Territory" for purposes of acts of Congress which included the terri-

tories. People of Puerto Rico v. Shell Co., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937) ; People ex rel. Kopel v. Bingham, 211 U.S. 468, 29 S.Ct. 190, 53 L.Ed. 286 (1909) ; Crespo v. United States, 151 F.2d 44 (1 Cir. 1945), cert. dismissed 327 U.S. 758, 66 S.Ct. 520, 90 L.Ed. 991 (1946). As the Supreme Court stated in the Kopel case, supra, 211 U.S. at 475, 29 S.Ct. at 192, the status of the Island conformed to one of the common definitions of a territory as a "portion of the country not included within the limits of any state, and not yet admitted as a state into the Union, but organized under the laws of Congress with a separate legislature, under a territorial governor and other officers appointed by the President and Senate of the United States."

In Detres v. Lions Building Corporation, supra, 234 F.2d at 600 the court stated : "The mere change of the name of Puerto Rico to the Commonwealth of Puerto Rico did not change Puerto Rico from a territory to a commonwealth unless its actual form of government was so changed as to actually make it a commonwealth." The defendants agree with this statement but assert that the fact is that Puerto Rico's form of government was drastically changed in 1952 and some of those changes are of a character having special impact on the question of whether Congress intended Puerto Rico to remain a territory for the purposes of Section 1332(d). Under the Act of July 3, 1950, Public Law 600, 64 Stat. 319, 48 U.S.C.A. Section 731b et seq., the people of the new Commonwealth were invested with powers of self government not characteristic of the sovereignty exercisable by citizens of a territory. They were enabled thereby to decide exclusively upon the number of branches of government, the extent of the powers of each branch, the method of election or appointment of personnel in each branch, the duration of terms of office of members of each branch, and the division of power as between each of the said branches.

4. 48 U.S.C.A. Section 731b.

There can be no doubt that as a matter of political and legal theory, and practical effect, Puerto Rico enjoys a very different status from that of a totally organized but unincorporated territory, as it formerly was. The government of the Commonwealth derives its powers not alone from the consent of Congress, but also from the consent of the people of Puerto Rico. However, under the terms of the "compact" the people of Puerto Rico, do not exercise the full sovereignty of an independent nation, since they do not have control of their external relations with other nations. Further, as United States citizens the citizens of Puerto Rico are assured that their right to due process of law is protected by the federal Constitution.

The legislative history of the Act of July 3, 1950, Public Law 600 offers strong support for the plaintiff's position that Puerto Rico, insofar as the issues at bar are concerned, may be deemed to have a status analogous to that of a territory. The House Committee Report stated, "It is important that the nature and general scope of S. 3336 [now 64 Stat. 319] be made absolutely clear. The bill under consideration would not change Puerto Rico's fundamental political, social, and economic relationship to the United States. Those sections of the Organic Act of Puerto Rico pertaining to the political, social, and economic relationship of the United States and Puerto Rico concerning such matters as the applicability of United States laws, customs, internal revenue, Federal Judicial jurisdiction in Puerto Rico, Puerto Rican representation by a Resident Commissioner, etc., would *remain in force and effect*, and upon enactment of S. 3336 would be referred to as the Puerto Rican Federal Relations Act." H.R.Rep. No. 2275, 81st Cong., 2d Sess. (1950), in 2 U.S. Code Cong. Serv., pp. 2681, 2682 (1950).[5]

When the Detres case was decided the diversity section, as we have previously stated, contained no specific reference to the Commonwealth of Puerto Rico. Significantly, congressional action, in the wake of the Detres decision, gives legislative approval to this interpretation. In amending Section 1332 to include the Commonwealth of Puerto Rico the Senate Committee stated, "The Seventh Circuit Court of Appeals held that even though the 1952 constitution refers to the 'Commonwealth of Puerto Rico,' at the same time it is within the meaning of the term 'Territory' in section 1332. The court indicates that there was no intention on the part of Congress to affect the status of Puerto Rico as far as the application of section 1332 was concerned when the new constitution was authorized. To remove any doubts, the House Judiciary Committee favorably reports H.R. 9038 to expressly include the Commonwealth of Puerto Rico in the coverage of section 1332 of title 28 of the United States Code." S.Rep. No. 2605, 84th Cong.2d Sess. (1956), in 2 U.S. Code Cong. and Adm. News, pp. 3557, 3558 (1956). Yet the actual passage of the amendment to Section 1332, indicates doubt as to the legal status of Puerto Rico as a Commonwealth. The Senate report also states that "H.R. 9038 fills an obvious gap in the law resulting from the change in status of Puerto Rico from a Territory to a Commonwealth."

Legal conclusions respecting the status of Puerto Rico as a commonwealth have varied from one extreme to the other. Chief Judge Magruder, long a student of Puerto Rican affairs, has commented that under certain statutes the Commonwealth may fall within the meaning of the word "State." He pointed out that, "The word 'State' may in the context of a particular act of Congress have a broader connotation than a state in the federal Union." Mora v. Mejias, 206 F.2d 377 (1 Cir. 1953). In Mora v. Mejias, Judge Magruder called attention to the provisions of 28 U.S.C. Section 2281, which requires the convening of a three-judge court whenever a suit is brought to re-

5. The Senate Report contains language which is identical in sense with the House Report. See S.Rep. 1779, 96 Cong.Rec. 8321 (1950).

strain the "enforcement, operation or execution of any State statute * * * upon the ground of the unconstitutionality of such statute. * * * " Although pointing out that the Supreme Court had ruled that Section 2281 did not apply to the territory of Hawaii, Stainback v. Mo Hock Ke Lok Po, 336 U.S. 368, 69 S.Ct. 606, 93 L.Ed. 741 (1949), he suggested a different result as to Puerto Rico. In analyzing the commonwealth status of Puerto Rico and the use of the word "State" in Section 2281, he found that Puerto Rico might well be considered a state now for purposes of this section. The district court accepted the suggestion, holding that the Commonwealth of Puerto Rico was not a territory in the sense that Hawaii was and that Section 2281 required the convening of a three-judge court for the final hearing. Mora v. Mejias, 115 F.Supp. 610 (D.P.R.1953).

Another view of Puerto Rico's commonwealth status was expressed in admitted dictum by a judge sitting on the District Court of Puerto Rico. He stated, "Puerto Rico is no longer a territory in the sense that the term is used in the Constitution and the cases. Therefore, if the Congress of the United States proposes in the future to make a statute applicable to Puerto Rico, I believe that, generally speaking, it will have to make it so other than by the use of the term 'Territory'." Cosentino v. International Longshoremen's Ass'n, 126 F.Supp. 420 (D.P.R.1954).

Congress in Chapter 79 (Definitions) of the Internal Revenue Code of 1954 has provided a separate section, 26 U.S.C. § 7701(c), for the Commonwealth of Puerto Rico which insures that it will be included within the term "possessions" when not incompatible with the intent of the Act.[6] The Senate Report on Section 7701 states that subsection (c) "is a clarifying amendment and does not change existing law." S.Rep., 83rd

Cong.2d Sess. (1954), in 3 U.S.Code Cong. and Adm.News, p. 5271 (1954).

As we can see the term "Territories" has been considered susceptible of interpretation—that is, it does not have a fixed and technical meaning that must be accorded to it in all circumstances. In People of Puerto Rico v. Shell Co., 302 U.S. 253, 58 S.Ct. 167, 82 L.Ed. 235 (1937), the Supreme Court specifically recognized that the word "Territory", as used in the Acts of Congress may have different meanings so that Puerto Rico may be found to be included within one Act and excluded in another, depending not only on a "consideration of the words themselves, but by considering, as well, the context, the purposes of the law, and the circumstances under which the words were employed." Id. at 258, 58 S.Ct. at 169. We believe we have demonstrated that Puerto Rico is a "Territory" within the purview of Article IV, Section 3.

Coming now to the issue, previously stated, as to whether Article IV, Section 3, provides the requisite constitutional authority for the 1956 amendment, we conclude that our answer must be "yes". We find the conclusion of Siegmund v. General Commodities Corp., 175 F.2d 952 (9 Cir. 1949) and Lummus Co. v. Commonwealth Oil Refining Co., 195 F.Supp. 47 (S.D.N.Y.1961), to be correct. The Siegmund opinion pointed out that the power of Congress to "make all needful Rules and Regulations respecting the territory * * * belonging to the United States" was expressly given by Article IV, Section 3 of the Constitution. Although the Siegmund case dealt with Hawaii, Lummus concerned the applicability of these principles to Puerto Ricans.

The second argument presented by the defendants is that Congress is without power to prescribe full faith and credit, in the courts of the several states to a

---

6. 26 U.S.C.A. Section 7701(c), provides, "Where not otherwise distinctly expressed or manifestly incompatible with the intent thereof, references in this title to possessions of the United States shall be treated as also referring to the Commonwealth of Puerto Rico."

judgment of the Superior Court of Puerto Rico. The issues presented in this argument are similar to those just discussed. Article IV, Section 1 of the Constitution commands that one state must give "full faith and credit" to the judicial proceeding of another state.[7] As was the case with jurisdiction of the courts the Constitution once again provides this effect only for "state" judicial proceedings. Congress in Section 1738, 28 U.S.C., while implementing this constitutional command, extended full faith and credit to the territories which the defendants contend is beyond their constitutional power.[8]

■■ The extension of full faith and credit by Section 1738 to the territories has met with the approval of the Supreme Court. Embry v. Palmer, 107 U.S. 3, 2 S.Ct. 25, 27 L.Ed. 346 (1882); Atchison, Topeka & Santa Fe Ry. v. Sowers, 213 U.S. 55, 29 S.Ct. 397, 53 L.Ed. 695 (1909); and Alaska Packers Assn. v. Industrial Accident Comm., 294 U.S. 532, 55 S.Ct. 518, 79 L.Ed. 1044 (1935).[9] In Embry v. Palmer, supra, where the subject matter of the litigation was the effect of a judgment of the Supreme Court of the District of Columbia, the Supreme Court of the United States stated "[S]o far as this statutory provision relates to the effect to be given to the judicial proceedings of the States, it is founded on art. 4, sect. 1, of the Constitution, which, however, does not extend to the other cases covered by the statute. The power to prescribe what effect shall be given to the judicial proceedings of the courts of the United States is conferred by other provisions of the Constitution, such as those which declare the extent of the judicial power of the United States, which authorize all legislation necessary and proper for executing the powers vested by the constitution in the government of the United States, or in any department or officer thereof, and which declare the supremacy of the national government within the limits of the Constitution. As part of its general authority, the power to give effect to the judgments of its courts is coextensive with its territorial jurisdiction. That the Supreme Court of the District of Columbia is a court of the United States, results from the right of exclusive legislation over the District which the Constitution has given to Congress. Accordingly, the judgments of the courts of the United States have invariably been recognized as upon the same footing, so far as concerns the obligation created by them, with domestic judgments of the States, wherever rendered and wherever sought to be enforced." Id. 107 U.S. at 9–10, 2 S.Ct. at 30–31. We are of the opinion that Congress has the power to legislate what effect must be given judicial proceedings of those territorial courts of the United States created by Congress as "legislative courts" under Article I, Section 8 and Article IV, Section 3 of the Consti-

7. Article IV, Section 1 provides, "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."

8. Section 1738, 28 U.S.C., provides: "The Acts of the legislature of any State, Territory, or Possession of the United States, or copies thereof, shall be authenticated by affixing the seal of such State, Territory or Possession thereto.
   "The records and judicial proceedings of any court of any such State, Territory or Possession, or copies thereof, shall be proved or admitted in other courts within the United States and its Territories and Possessions by the attestation of the clerk and seal of the court annexed, if a seal exists, together with a certificate of a judge of the court that the said attestation is in proper form.
   "Such Acts, records and judicial proceedings or copies thereof, so authenticated, shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken.

9. The section has been applied in Perkins v. Benguet Consol. Mining Co., 55 Cal. App.2d 720, 132 P.2d 70 (1942), cert. denied, 319 U.S. 774, 63 S.Ct. 1435, 87 L. Ed. 1721 (1943); Butler v. Butler, 179 Misc. 651, 40 N.Y.S.2d 353 (1943), and Hall v. Hall, 238 Md. 191, 208 A.2d 593 (1965).

tution. In view of this authority there is no doubt that the extension of full faith and credit by Section 1738 to include judgments of the courts of the territories and possessions of the United States is constitutional.

The third issue raised by the defendants involves an extension of the previous argument. Defendants contend that even if the application of full faith and credit to the territories by Section 1738 is constitutional a judgment of the Superior Court of Puerto Rico is not a judgment contemplated by this section of the statute. Defendants point out that in 1952 [10] Puerto Rico became a Commonwealth. Section 1738, unlike Section 1332(d), does not specifically refer to the Commonwealth of Puerto Rico. Defendants point out that while Congress specifically amended Section 1332 to include the Commonwealth of Puerto Rico, this same Congress took no action respecting amendment of Section 1738.

■ We point out, however, that Section 9 of the Federal Relations Act provides that, "The statutory laws of the United States not locally inapplicable, except as * * * otherwise provided, shall have the same force and effect in Puerto Rico as in the United States * * *." 48 U.S.C.A. Section 734. The defendants admit that there is a government of the United States in Puerto Rico and that many statutory laws of the United States have the same force and effect in Puerto Rico as in the United States. In Moreno Rios v. United States, 256 F.2d 68 (1 Cir. 1958) the court held that the Narcotic Drugs Import and Export Act continued to be applicable to Puerto Rico after its acquisition of commonwealth status. See also United States v. De Jesus, 289 F.2d 37 (2 Cir. 1961). In view of Section 9, it is not necessary for Congress to alter specifically all outstanding statutes theretofore previously applicable in order to continue their effectiveness in Puerto Rico after it became a commonwealth. In the instant case, the defendants point out that the plaintiff is claiming continuing force and effect "in the United States" for the provisions of Section 1738 while the Federal Relations Act, Section 9, deals only with the "force and effect in Puerto Rico" of statutes of the United States. We cannot conclude that the defendants' distinction is determinative of the issue before this court. Although Section 9 is not conclusive authority, it aids in understanding what Congress intended the relationship and status of the Commonwealth of Puerto Rico to the United States to be. Further the Foraker Act provided that the laws and ordinances then in force in Puerto Rico should continue in force and effect except insofar as they were inconsistent with the applicable statutory laws of the United States and with the provisions of the Foraker Act or which were altered thereafter pursuant to the provisions of that Act.

■ The basic goal of full faith and credit is to coordinate the administration of justice throughout the nation. In order to achieve this goal Congress enacted Section 1738 and by use of the words "State, Territory or Possession" Congress intended to unify all of the courts in our system of government. Defendants' contention in substance amounts to this—When Puerto Rico became a commonwealth its courts ceased to be within our system of government. We concur that with the creation of the Commonwealth something important occurred in Puerto Rico. We have, however, demonstrated that Puerto Rico was a "Territory" prior to 1952. When we also consider the congressional intent manifested by (1) the Puerto Rico Federal Relations Act, viz., that those laws applicable to Puerto Rico prior to 1952 remain applicable, (2) the Foraker provisions to the same effect, and (3) the House and Senate reports accompanying the bill which approved the commonwealth status of Puerto Rico and stated that, "The bill under consideration would not change Puerto Rico's fundamental political,

10. See Magruder, The Commonwealth Status of Puerto Rico, 15 Pitt.L.Rev. 1 (1953).

social, and economic relationship to the United States," and that under S. 3336, when enacted, those sections of the Organic Act of Puerto Rico, pertaining to the political, social, and economic relationship of the United States and Puerto Rico concerning such matters as the applicability of United States laws, customs, internal revenue and the federal judicial jurisdiction in respect to Puerto Rico would remain in force and effect, we conclude that the Puerto Rican judgment is entitled to full faith and credit.

The judgment of the district court will be affirmed.